CENTRAL TRUST CO. v. GEORGIA PAC. RY. CO. (POND-DECKER LUMBER CO., Intervener).

(Circuit Court, N. D. Georgia. May 12, 1897.)

MEASURE OF DAMAGES—BREACH OF CONTRACT BY CARRIER.

> Where the agent of a connecting carrier by mistake has given to a shipper an unusually low rate on a special shipment, and the initial carrier, without knowledge of such rate, breaks its contract of carriage by sending the goods over a different road from that mentioned in the bills of lading, so that the shipper is compelled to pay the usual rate of freight, the initial carrier is liable, because of the breach, only for such damages as might reasonably have been within the contemplation of the parties on making the contract, and not for the whole difference between the regular rate and the special rate, of which it had no notice.

W. R. Hammond, for intervener.
Glenn, Sloten & Phillips, for defendants.

NEWMAN, District Judge. This is an intervening petition in the above-stated case. It amounts, practically, to a suit by the intervener, the Pond-Decker Lumber Company, against the receivers operating the Georgia Pacific Railway Company under order of this court. Intervener proposed to purchase a sawmill located at Tallapoosa, Ga., on the line of the defendant company, for the purpose of removing the same to Gilmore, Ark., on the line of the Kansas City, Ft. Scott & Memphis Railroad. To this end it entered into corre-

spondence with J. J. Fletcher, the general freight agent of the last-named company, who was also the general freight agent of the Kansas City, Memphis & Birmingham Railroad Company, for a rate on this mill, to be taken down and transported from Tallapoosa, Ga., to Gilmore, Ark. It was estimated that there would be at least 6 car loads, whereas, in point of fact, it turned out to be 11 car loads. A rate of 36 cents per 100 pounds was given by Fletcher to the intervener, and the mill was purchased, taken down, and shipped. Fletcher testifies, and the special master to whom this intervention was referred finds as a fact, that this rate of 36 cents per 100 pounds was given by mistake. It is also conceded that the regular and usual rate on this freight would have been 66 cents per 100 pounds. The rate given was over the Georgia Pacific Railroad Company, from Tallapoosa to Birmingham; thence, by way of the Kansas City, Memphis & Birmingham Railroad, to Memphis; and thence, by way of the Kansas City, Ft. Scott & Memphis Railroad, to Gilmore, Ark., the point of destination. Bills of lading were made out in this way when the freight was shipped at Tallapoosa. The agents of the receivers operating the Georgia Pacific Railroad, instead of delivering the freight at Birmingham to the Kansas City, Memphis & Birmingham Railroad, carried the goods to Winona, a point on the Georgia Pacific Railroad beyond Birmingham, and delivered the same to the Illinois Central Railroad, which intersects the Georgia Pacific Railroad at Winona, and the freight was transported from Winona over the Illinois Central to Memphis, and thence, by the Kansas City, Ft. Scott & Memphis Railroad, to Gilmore.

There is no complaint as to the delivery of the goods at the proper time and in the proper condition at Gilmore, and no fault is found on this score with the diversion or change of route. But, when the freight reached Gilmore, the regular rate of 66 cents per 100 pounds was demanded, which seems subsequently to have been reduced to 64 cents, allowing a reduction of 2 cents on the rate from Memphis to Gilmore over the Kansas City, Ft. Scott & Memphis Railroad. Fletcher, the general freight agent, testifies that, although the rate was given by mistake, he would have protected it if the goods had been shipped, as contemplated, over the Kansas City, Memphis & Birmingham Railroad, and not over the Illinois Central, and he would have called on the other roads to have helped him out and sustained him in protecting this reduced rate; but, as the goods were carried over the Illinois Central, he could not do so. This intervening suit seeks to recover the difference between the 36 cents per 100 pounds, and the 64 cents per 100 pounds actually paid. The evidence fails to show that the agents of the receivers had any notice of the special rate given by Fletcher to the intervener. A witness did testify that there was such notice, but on cross-examination it developed that his only reason for so stating was that he had been told that such notice was given, showing it to be mere hearsay, which, of course, cannot be considered.

The contention of counsel representing the receivers is that there would be no liability on the part of the receivers to intervener for damages on account of this reduced rate, especially as it was a

rate given by mistake, unless notice of such largely reduced rate had been given the receivers. Counsel cite, in support of this contention, the case of Langdon v. Robertson, 13 Ont. 497, 30 Am. & Eng. Ry. Cas. 23. The facts of that case are quite similar to the facts here. There was a special rate of freight over one route, that named in the bill of lading, and the goods were diverted by the initial carrier, and sent over a different route, and it was held that, while the plaintiffs were entitled to recover, they were only entitled to recover nominal damages. This decision, which reverses the trial court, was placed clearly and distinctly on the ground of want of notice by the initial carrier of the special rate to be allowed the shipper over the route from which the goods were diverted. It is only necessary to quote a paragraph from the opinion to show this, which is as follows:

"The evidence, to my mind, clearly establishes that the defendant, not negligently, but willfully, sent the goods by Duluth, instead of Milwaukee; but they reached their destination as quickly, or more quickly, than they would have done by Milwaukee, and also for less freight, were it not for the plaintiff's special agreement with the railways running from Milwaukee. By his willful disregard of his contract he should properly be held responsible for all damages that, under the law, may reasonably be awarded against him; and, if he had sufficiently specific notice of the plaintiff's contract, so that it might be fairly assumed that the contract he made to carry the goods was made in reference to the contract, the sum awarded by the learned chief justice would be the correct amount."

In the case cited, several authorities bearing on the question at issue were reviewed, and quotations from some of the opinions were given. The result apparently reached may be stated in a brief extract from one of the opinions quoted in this decision, which is as follows:

"A person can only be held to be résponsible for such consequences as may reasonably be supposed to be in contemplation of the parties at the time of making the contract."

The rule unquestionably is that, for a breach of contract, such damages only may be recovered as would, in the contemplation of the parties at the time the contract was made, ordinarily and naturally follow the failure to perform the contract.

Booth v. Mill Co., 60 N. Y. 487, is cited and relied on by counsel for the intervener. The rule laid down in that case may be gathered from that part of the syllabus covering this question, as follows:

"Where the parties to a contract of sale have such knowledge of special circumstances affecting the question of damages as that it may be fairly inferred they contemplated a particular rule for estimating them, and entered into a contract upon that basis, that rule will be adopted."

There is no departure in that case, however, from the general line of authorities on this subject, as to the extent of damages growing out of a breach of contract, as already discussed. The first sentence of the paragraph of the opinion as to the measure of damages in such case is in these words:

"The damages for which a party may recover for a breach of contract are such as ordinarily and naturally flow from the nonperformance."

The contention of counsel for the intervener is, however, that the circumstances surrounding this shipment were such as to put the receivers on notice that a special rate had been given the shippers. What are these circumstances? First. The unusual character of the shipment. It was an entire sawmill, so far as it could be taken down, and it was all shipped at one time. There were 11 car loads embraced in one shipment. Secondly. It was billed to go a particular route. It is claimed that these circumstances are sufficient to put a railroad man, familiar with the practice of railroads and freight agents in such matters, on notice that a less rate than the regular rate would be given, and that an experienced railroad man would also know that the same could be given without violating the interstate commerce law, or any law, because it was an unusual shipment, and there would be no discrimination or undue preference against other shippers, as no shipment of similar character would ever probably be made.

Conceding that the agents of the receivers were put on notice that something less than the usual rate might be allowed for a shipment of this character, can it be held that they must take notice, and must contract in contemplation, of a mistake on the part of the general freight agent of connecting lines? It is a fact, established in the case, and the master so finds, that the rate given by Fletcher, the general freight agent of the connecting lines, being a remarkably low rate when compared with the regular rate, was made by mistake. It cannot be true that the initial carrier can be held to have had in contemplation, at the time goods are received for carriage, that a connecting line would make a mistake as to the rate on the goods given the shipper. It seems, from the facts in this case, that the general freight agent was under a misapprehension as to what the regular rate was. Now, if this general freight agent, with a knowledge of what the regular rate was, had made some reasonable deduction from it, and the proof showed that such reduction was usual, or even frequent, in a shipment of unusual character, and a recovery was based on such facts, there would be some ground for sustaining it under the rule contended for on the part of the intervener. Such are not the facts here, however. In the extract which has been given from the opinion of the court in the case of Langdon v. Robertson, supra, the notice which must be brought home to the initial carrier is alluded to as "specific notice." And in another place in the opinion it is alluded to as "sufficiently specific or precise notice." There might be difficulty, therefore, if it were necessary to do so, in reconciling this Canada case with the New York case cited for the intervener; but it is unnecessary to do so, for, conceding the doctrine of the New York case to be correct, and that circumstances may put the initial carrier on notice, and that "specific or precise notice" is not necessary, it cannot be held, that the receivers in this case could have contracted in contemplation of the fact that the general freight agent of the connecting lines would make a mistake as to the rate, and that a breach of the contract would be followed by unusual damages growing out of such mistake. I am clear, therefore, that the initial carrier, having no knowl-

edge of the special rate—an unusually low rate—given the intervener, cannot, for a mere diversion of the goods, when they were delivered in good condition and in time, be held liable to the extent reported by the special master.

It was claimed on the part of the intervener that, because notice to the receivers was not alleged in the intervention, and the intervening petition was not demurred to, that it was unnecessary for such notice to be proven. The fact that the intervention fails specifically to allege notice did not relieve the intervener from the necessity of making out his case according to law. It seems that, when the intervener proposed to go into this question before the special master, the master ruled, either because he deemed such specific allegation unnecessary, or because there had been a failure to demur to the intervention on that ground, that the evidence should be admitted, and evidence was offered on this subject, as has been mentioned.

Counsel for the intervener has requested, in the course of the argument, that, if the judgment of the court should be against him on the subject of lack of notice to the receivers of the special rate given by the general freight agent of the other lines, he be allowed an order referring the case back to the special master to hear evidence on this subject. Counsel claims that he will be able to show by evidence that such notice was actually given to the receivers' agents. It would, in my opinion, be a violation of the correct practice to allow a case to be referred back to the master to take additional evidence, after it has reached the stage of the present case, except under most unusual circumstances, where there was a clear inadvertence, omission, or mistake of some sort to justify it. An effort was made before the special master to prove notice to the receivers, and the failure to do so was for the reason already stated, —the evidence relied upon was shown to be mere hearsay. The difficulty, confusion, and delay which would result from allowing reference back to the master in a case like this must be apparent. In the case of Sanges, intervener in the case of Central Trust Co. v. Marietta & N. G. Ry. Co., a similar request was made and was denied at the last term. 75 Fed. 41.

Thus far I have no difficulty about a proper disposition of this case, but as to what the rights of the intervener are in view of the opinions above expressed is the real difficulty. While I am satisfied that the intervener is not entitled to recover on the basis allowed it by the special master,—that is, for the difference between what it actually paid for freight on the machinery and the rate given by mistake by the general freight agent,—still it seems that there should be a recovery for more than mere nominal damages. The measure of such damages can only be determined by intelligent jurors, or by a master to whom such a case is referred. I think it is true that there should have been in the contemplation of the parties, at the time this contract of carriage was made, the fact that the freight agent would make some reasonable deduction from the usual rate for a shipment of this character, so that this should be the basis, somewhat uncertain though it necessarily is, by which

the rights of the intervener must be determined. There is abundance of authority for damages found in this way. Now, unless the parties can agree as to what would be a proper measure of damages in view of the foregoing suggestion, this case will be referred back to the special master, not to take new evidence, but to find what would be a proper recovery in accordance with the views of the court as herein expressed.